RAFAEL M. GONZALEZ, JR.
ACTING UNITED STATES ATTORNEY
TRACI J. WHELAN, IDAHO STATE BAR NO. 4416
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF IDAHO
6450 N. MINERAL DRIVE SUITE 210
COEUR D'ALENE, ID 83815
TELEPHONE: (208) 667-6568
FACSIMILE:  (208) 667-0814

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>LOREN MICHELLE TOELLE,<br><br>Defendant. | Case No. 16-CR-00019-N-BLW-1<br><br>**UNITED STATES' OBJECTION TO MOTION FOR REDUCTION OF SENTENCE UNDER 18 U.S.C. § 3582(c) (COMPASSIONATE RELEASE)** |

The United States of America, by and through Rafael M. Gonzalez, Jr., Acting United States Attorney, and the undersigned Assistant United States Attorney for the District of Idaho, submits this response to Defendant's Pro Se Motion for Compassionate Release. (ECF 569.)

Defendant Loren Michelle Toelle seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). This motion should be denied, given that the Defendant does not have extraordinary and compelling reasons permitting relief, she has been fully vaccinated against COVID-19, the danger that the Defendant presents to the community, the time remaining on her sentence, and all other considerations under 18 U.S.C. § 3553(a).

UNITED STATES' OBJECTION TO MOTION FOR REDUCTION OF SENTENCE - 1

I.      Background

   A.      Criminal Conduct

Loren Toelle was the leader and organizer of a drug conspiracy which conducted business for several years and in different states.[1] She first came to the attention of federal and local law enforcement in Coeur d'Alene, Idaho in 2009. An investigation ensued and ultimately the Defendant was arrested and charged with Distribution of a Controlled Substance in Kootenai County case CR-2010-0007970. She was sentenced to an eight-year suspended prison sentence, with five years of probation, 90 days local incarceration, and 100 hours of community service. This sentence did not have the desired effect of deterrence.

Within months of release from her 90-day sentence, the Defendant returned to selling drugs. Based upon her review of the discovery and having learned how law enforcement caught her the first time, the Defendant made changes within her organization and how it conducted business. Instead of using bank accounts to collect her profits, she directed her co-conspirators to use green dot cards, wire transfers and pre-paid Visa cards to launder the money. She expanded her circle of distribution geographically but sought to limit the number of people she directly sold to and who redistributed her product.

State and federal law enforcement became aware that the Defendant was back in business and an investigation was conducted. The investigation was exhaustive and involved the FBI, DEA, IRS, USMS, and local law enforcement from Idaho, Montana, Nevada and North Dakota. Records for rail and air travel were reviewed, financial records were subpoenaed and categorized, statements and information from cooperating defendants and co-conspirators along

---

[1] The Defendant's crimes were extensively outlined in the 57-page presentence report filed in this case as ECF 397. The United States has tried to summarize it above.

with confidential informants were compared and Fed Ex and other postal records were obtained. At the conclusion of the investigation, a clear picture of the Loren Toelle drug organization was realized. The Defendant created a drug trafficking organization responsible for conspiring and distributing at least 4,000 oxycodone pills, 1.5 kilograms of heroin and 500 grams of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (B)(1)(b)(i) and 846. (PSR ¶ 232.) She also was the leader of a conspiracy which laundered over 1.4 million dollars of drug proceeds in violation of 18 U.S.C. § 1956(h). (PSR ¶ 223.) The Defendant commanded this group with tight control, designating the roles her co-conspirators would play, what drugs were sold, how they were shipped, the price, the packaging, the location of the stash houses, and who would have access to the controlled substances. The Defendant was sentenced to 212 months imprisonment to be followed by five years supervised release for her crimes. (ECF 423.)

The Defendant is serving her sentence at FCI Dublin and has served less than one third of her sentence.

  **B.**  **Request for Compassionate Release**

The Defendant submitted her request for compassionate release to the Warden on June 19, 2020. The request was based upon her concerns regarding COVD-19 and her age of 55 years old, and her claim of a history of heart disease (COPD). (Exhibit A, pp. 182-185.) The Warden denied this request on July 16, 2020. (Exhibit A, p. 186.) On June 22, 2021, the Defendant, acting pro se, submitted a motion to this Court for compassionate release. (ECF 569.) She checked the box that claimed she has "a serious physical or medical condition; a serious functional or cognitive impairment; or deteriorating physical or mental health because of the aging process that substantially diminishes her ability to provide self-care within the environment of a correctional facility, and is not expected to recover from this condition." (ECF

569, p. 4.) She went on to explain that she is losing her hearing and indicated that things have worsened since the pandemic. (ECF 569, p. 5.) There were no medical records or supporting documents attached to the Defendant's motion.

The undersigned obtained the Defendant's medical records from BOP, which are filed under seal as Exhibit A. The records reveal that the Defendant, who is 56 years old, has had some medical complaints while incarcerated. For instance, in May of 2019 she presented with a report of right shoulder pain which she attributed to repetitive motion as a dancer and was given a shot in the shoulder to address the pain. (Exhibit A, pp. 005-006.) In March of 2019, she expressed anxiety due to being accused of committing a sexual assault by another prisoner and asked to try Buspar, an anti-anxiety medicine. (Exhibit A, pp. 001-012.) The Defendant was prescribed Buspar and in a follow-up visit indicated she was doing better. (Exhibit A, p. 007.) During a February 2020 visit she reported she stopped taking the medicine and would not resume. (Exhibit A, p. 098.) Notably none of the records outline any complaints or concerns regarding heart issues or chronic obstructive pulmonary disease. In fact, the records reflect that the Defendant denied any issues with her cardiovascular or respiratory systems. (Exhibit A pp. 027, 032.) The results of a medical screening in 2019 showed her lungs were clear with no wheezing or crackles and her cardiovascular system was normal. (Exhibit A, p. 039.)

In reviewing the records, the United States learned that the Defendant received two doses of the Pfizer-BioNtech vaccine for COVID-19 on May 25, 2021, and June 16, 2021. (Exhibit A, pp. 177-179.)

    C.    **BOP's Response to the COVID-19 Pandemic**

As the Court is aware, from the moment the pandemic began, the Bureau of Prisons (BOP) made extensive changes to its operations, based on a plan that was prepared over many

years, and refined in early 2020 in consultation with the Centers for Disease Control and the World Health Organization. Those efforts continue today.

BOP's "action plan" is described in detail at www.bop.gov/coronavirus/. As part of that plan, all newly arriving inmates are quarantined and not released into the general population until 14-days have passed and the inmate has tested negative; inmate movement within an institution is restricted in order to promote social distancing; mask wearing by inmates and staff is required; all facility staff are screened for symptoms daily; social visiting has been suspended at nearly all institutions; and access by other outsiders is restricted to only those performing essential services, who are also screened before entry.

In addition, acting under the authority granted in the CARES Act, BOP has transferred many thousands of inmates to home confinement, focusing on nonviolent offenders who have served the majority of their sentences.[2] This initiative, combined with the reduced number of new arrivals during the pandemic and the ordinary release of prisoners upon completion of their sentences, has led to a dramatic decrease in the total BOP population, which in turn has increased opportunities for social distancing and reduced the strain on BOP resources. At the beginning of the pandemic, the total BOP population was approximately 170,000. Today, it is at its lowest population in decades, having decreased by more than 10% since the beginning of the pandemic.

---

[2] This Court does not have authority to grant a transfer to home confinement, or review BOP's administrative decision regarding that issue. *See* 18 U.S.C. § 3621(b) (BOP's designation decision is not subject to judicial review); *see also, e.g.*, *United States v. Gray*, 2020 WL 6822949, at *2 (E.D. Pa. Nov. 20, 2020) (Sanchez, C.J.); *United States v. Rodriguez-Collazo*, 2020 WL 2126756, at *2-3 (E.D. Pa. May 4, 2020) (Younge, J.); *United States v. Pettiway*, 2020 WL 3469043, at *2 (E.D. Pa. June 25, 2020) (Bartle, J.); *United States v. Torres*, 2020 WL 3498156, at *5-6 (E.D. Pa. June 29, 2020) (Kearney, J.); *United States v. Cruz*, 2020 WL 1904476, at *4 (M.D. Pa. Apr. 17, 2020); *United States v. Mabe*, 2020 U.S. Dist. LEXIS 66269, at *1 (E.D. Tenn. Apr. 15, 2020) ("the CARES Act places decision making authority solely within the discretion of the Attorney General and the Director of the Bureau of Prisons. . . . This Court therefore does not have power to grant relief under Section 12003 of the CARES Act.").

When an outbreak does occur, any infected inmate is immediately quarantined, and all contacts (including entire housing units if warranted) are tested and quarantined as necessary, until all contacts return at least two negative tests in a two-week period.

All of these strenuous efforts have been fruitful. To be sure, there is no way to stop this virus short of widespread worldwide vaccination; inmates inevitably will be infected, and some may succumb, just as in the population at large. However, the rate of deaths in federal prisons as a whole has been lower than that in the general U.S. population, a notable achievement given the known risks of viral spread in a congregate prison setting.[3] Further, the incidents of positive cases in all BOP institutions have been sharply declining for months, with nearly all institutions currently reporting no cases or case tallies in the single digits.

Specifically, as it relates to the Defendant, BOP's aggressive efforts have extended to FCI Dublin. BOP Dublin houses 759 inmates with 666 at the federal correctional institution and 93 at the camp. At present, there is one inmate who has reportedly tested positive, and is currently isolated while they are treated/recover. The latest statistics are available at www.bop.gov/coronavirus.

---

[3] According to the U.S. Census Bureau, the estimated resident adult population of the United States (age 18 and over) on July 1, 2019, was 255,200,373. *See* https://www.census.gov/data/tables/time-series/demo/popest/2010s-national-detail.html. As of June 30, 2021, there have been approximately 602,133 adult deaths in the United States from COVID-19. *See* https://covid.cdc.gov/covid-data-tracker/#datatracker-home (there have been fewer than 300 deaths of persons under age 18, *see* https://www.cdc.gov/nchs/nvss/vsrr/covid_weekly/index.htm#SexAndAge, and we subtract that sum from the national total). The estimated number of adult deaths is thus approximately 0.232% of the pre-pandemic adult population. According to BOP, the average population of BOP-managed institutions and community-based facilities in March 2020 was 157,756. As of June 30, 2021, there have been 240 COVID-related deaths, which is approximately 0.150% of the March 2020 average population, that is, approximately 35% below the national rate. Five of the 240 COVID-related deaths occurred while inmates were in home confinement and not at the facility.

### E. Vaccinations

BOP is working with the CDC and the federal government's COVID-19 Vaccine/Therapeutics Operation (formerly known as Operation Warp Speed) to ensure that BOP receives the COVID-19 vaccine as it becomes available. Doses of the vaccine were delivered to every BOP institution by February 2021. BOP offered the vaccine first to full-time staff because staff members—who come and go between the facility and the community—present a more likely vector for COVID-19 transmission into an institution. As of this time, vaccines have been administered to all willing staff members, and BOP continues to encourage staff members who have not accepted a vaccine to do so. (Staff members may also obtain and have obtained vaccinations from other providers in the community.)

At FCI Dublin, where the Defendant is held, BOP has fully vaccinated 174-staff members, and 686-inmates (which is 90% of the current inmate population). This is a much higher vaccination rate than the 41% rate in Nevada where the Defendant has proposed to be released. https://usafacts.org/visualizations/covid-vaccine-tracker-states/state/nevada

The clinical guidance provided to BOP health services professionals is available at https://www.bop.gov/resources/pdfs/covid19_vaccine_guidance_20210311.pdf. The latest information on BOP's vaccination efforts, including the number of completed vaccinations at each institution, is available at https://www.bop.gov/coronavirus/, and is updated every weekday.

## II. Discussion

### A. Applicable Law

"A federal court generally 'may not modify a term of imprisonment once it has been imposed.'" *Dillon v. United States*, 560 U.S. 817, 819 (2010) (quoting 18 U.S.C. § 3582(c)). Congress provided an exception to this general rule in 18 U.S.C. § 3582(c), commonly referred to as compassionate release. It recently amended that statute to allow defendants to file motions themselves, instead of merely allowing the Bureau of Prisons to do so. *See United States v. Aruda*, 993 F.3d 797, 800 (9th Cir. 2021). Accordingly, a federal district court may now reduce a sentence under § 3582(c) upon the motion of a defendant if, "after considering the factors set forth in section § 3553(a) to the extent they are applicable," the court finds that either:

…

> (i) extraordinary and compelling reasons warrant such a reduction; or
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g); and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A) and (2).

Thus, a court must examine the relevant § 3553(a) factors and determine if they support the motion and it must decide if "extraordinary and compelling reasons" exist to support the motion. Both determinations are required. If the Defendant fails to satisfy either one, the Court

must deny her motion. If the Defendant fails to satisfy both, the Court has two alternative bases for denying the motion. That is the situation in this case.

Congress specified that "rehabilitation alone" does not constitute an extraordinary and compelling reason, *see* 28 U.S.C. § 994(t), but did not otherwise define that term. Instead, Congress directed the Sentencing Commission to promulgate a policy statement that "describe[s] what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t); *see also* 28 U.S.C. § 994(a)(2)(C). No applicable policy statement yet exists for motions filed by defendants. *See United States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021). The existing policy statements, which were promulgated by the Sentencing Commission when only the Bureau of Prisons could file such motions, may guide the court, but they do not bind it. *Id.*[4]

B. **COVID-19 and Compassionate Release**

The fact of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not alone provide a basis for a sentence reduction. The guideline policy statement describes specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. The Third Circuit therefore held: "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *see United States v. Roeder*, 807 F. App'x 157,

---

[4] The Sentencing Commission's policy statement regarding motions for compassionate release filed by the Bureau of Prisons under § 3582(c)(1)(A) is found at U.S.S.G. § 1B1.13. U.S. SENT'G GUIDELINES MANUAL § 1B1.13 (U.S. SENT'G COMM'N 2018).

161 n.16 (3d Cir. 2020) (per curiam) (not precedential) ("[T]he existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within our Circuit."); *see also United States v. Hegyi*, 2020 WL 7090710, at *2 (N.D. Ind. Dec. 4, 2020) (Van Bokkelen, J.) ("the presence of COVID-19 in a prison, even in large numbers, does not justify compassionate release on its own.").

The CDC's list of risk factors was most recently updated on March 29, 2021. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. It reports a list of conditions that "can make you more likely to get severely ill from COVID-19." An inmate who has not been offered a vaccine, who presents a condition on that list, presents an "extraordinary and compelling reason" allowing consideration of compassionate release.[5]

---

[5] Before March 29, 2021, the CDC presented two separate lists of conditions that either definitively entailed a greater risk of severe illness or "might" entail a greater risk of severe illness. Those "might" conditions were asthma (moderate-to-severe); cerebrovascular disease; cystic fibrosis; hypertension; immunocompromised state from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines; neurologic conditions, such as dementia; liver disease; overweight; pulmonary fibrosis; thalassemia; and type 1 diabetes mellitus. At that time, the government maintained—and most courts agreed—that inmates with conditions on the "might" list did not present an extraordinary basis for relief. *See, e.g.*, *United States v. Durham*, 2020 WL 5577884, at *2 (W.D.N.C. Sept. 17, 2020) (Cogburn, J.); *United States v. Moldover*, 2020 WL 6731111, at *9 (E.D. Pa. Nov. 13, 2020) (Slomsky, J.) ("District courts have routinely denied motions for compassionate release based on allegations of only potential COVID-19 risk factors, including asthma and hypertension.").

In the March 29th revision, the CDC merged the two lists without extensive explanation. The CDC also presents a page with information for healthcare providers, which discusses the evidentiary basis for designating each risk factor and indicates that there remains less extensive support for drawing conclusions regarding most conditions formerly listed as "might" factors. *See* https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-care/underlyingconditions.html. The government nevertheless continues to follow CDC guidance and therefore relies on the

### III. The Defendant's Circumstances

#### A. The Defendant Has Not Proven Extraordinary and Compelling Circumstances

The Defendant is not eligible for compassionate release because she has not shown she has any condition that is on the CDC's list of risk factors. As outlined earlier, the United States has reviewed the medical records and has not found any serious physical or medical condition which substantiates her claim of extraordinary and compelling reasons for release, therefore the motion should be denied. *See, e.g.*, *United States v. Williams*, 2020 WL 4001045, at *2 (E.D. Pa. July 14, 2020) (Bartle, J.) (denied for inmate who presents no health conditions); *United States v. Cato*, 2020 WL 4193055, at *2 (E.D. Pa. July 21, 2020) (Beetlestone, J.) (same); *United States v. Moore*, 2020 WL 4193012, at *1 (E.D. Pa. July 21, 2020) (Pappert, J.) (same); *United States v. Ramirez-Ortega*, 2020 WL 4805356, at *2 (E.D. Pa. Aug. 18, 2020) (DuBois, J.) (same); *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (Drain, J.) (denied for 28-year-old inmate at institution with outbreak); *United States v. Haney*, 454 F. Supp. 3d 316 (S.D.N.Y. Apr. 13, 2020) (Rakoff, J.) (denied for 61-year-old with no other conditions).

#### B. Defendant is Vaccinated

The Defendant has received both doses of the Pfizer vaccine. (Exhibit A, pp. 177-179.) That similarly precludes eligibility for compassionate release. *See, e.g.*, *United States v. Smith*, 2021 WL 364636, at *2 (E.D. Mich. Feb. 3, 2021) (Ludington, J.) ("absent some shift in the

---

CDC's expanded list to define what constitutes an "extraordinary and compelling" basis for consideration of compassionate release of an inmate who has not been offered a vaccine.

It also bears noting that although age is not listed as a separate risk factor, the CDC has emphasized that it is an important indicator of risk. The CDC page regarding risk factors, updated on March 29, 2021, states: "More than 80% of COVID-19 deaths occur in people over age 65, and more than 95% of COVID-19 deaths occur in people older than 45."

scientific consensus, Defendant's vaccination against COVID-19 precludes the argument that his susceptibility to the disease is 'extraordinary and compelling' for purposes of § 3582(c)(1)(A).").

As a result, the Defendant's motion for compassionate release should be denied. As the government has explained, the pertinent guideline policy statement treats as an "extraordinary and compelling" circumstance "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 app. note 1(A)(ii). During the pandemic the government has acknowledged that an unvaccinated inmate who presents a medical risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19, and who is not expected to recover from that condition, presents an extraordinary and compelling circumstance under that provision. That circumstance, however, does not exist in this case. The Defendant has received a vaccine approved by the FDA for emergency use based on its conclusion that, in extensive testing, the vaccine was 95% effective in preventing COVID-19 infection, including in participants with medical comorbidities associated with high risk of severe COVID-19 disease. *See* FDA Decision Memorandum, Pfizer—Dec. 11, 2020, https://www.fda.gov/media/144416/download.

Recent decisions overwhelmingly agree with this assessment. *See, e.g.*, *United States v. Cortez*, 2021 WL 689923 (D. Ariz. Feb. 23, 2021) (Logan, J.); *United States v. Godoy-Machuca*, 2021 WL 961780, at *2 (D. Ariz. Mar. 15, 2021) (Humetewa, J.) (defendant also recovered from COVID-19, providing an additional measure of protection); *United States v. Smith*, 2021 WL 1890770, at *3-6 (E.D. Cal. May 11, 2021) (Mueller, J.) (extensive discussion, concluding that there is a "rebuttable presumption" that "if a defendant has received at least the first dose of an authorized vaccine and, if necessary, has scheduled a second dose as specified by the

manufacturer and authorized by the [FDA], then the risk of severe harm from COVID-19 is not an 'extraordinary and compelling' reason under § 3582(c)(1)(A)(i) unless the defendant offers evidence of an elevated personal risk despite vaccination."); *United States v. Jackson*, 2021 WL 1927506, at *3 (N.D. Cal. May 13, 2021) (Breyer, J.); *United States v. Grummer*, 2021 WL 568782, at *2 (S.D. Cal. Feb. 16, 2021) (Sabraw, C.J.) (denying compassionate release to defendant with several chronic medical conditions when defendant had been fully vaccinated against COVID-19).

   E.   **The § 3553(a) Factors Weigh Against Relief**

This Court must consider the § 3553(a) factors. *See United States v. Doe*, 833 F. App'x 366 (3d Cir. 2020) (per curiam) (not precedential) (summarily affirming the denial of compassionate release, in a case in which the defendant presented medical risk, upon holding that the district court did not abuse its discretion in considering the nature of the offense, the defendant's history, and the status of the virus at the facility); *United States v. Bullock*, 833 F. App'x 934 (3d Cir. 2021) (per curiam) (not precedential) (granting motion for summary affirmance of denial of compassionate release, as the district court did not abuse its discretion in denying relief for medically vulnerable inmate upon considering the § 3553(a) factors, including the substantial time remaining to be served on the sentence and the defendant's criminal history and institutional infractions).

Relevant factors in this case include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—
   (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
   (B)   to afford adequate deterrence to criminal conduct;
   (C)   to protect the public from further crimes of the defendant;
          . . .

UNITED STATES' OBJECTION TO MOTION FOR REDUCTION OF SENTENCE - 13

The Defendant has failed to demonstrate how her release, less than 65 months into a 212-month sentence for her extensive criminal conduct, even remotely adequately addresses the 18 U.S.C. § 3553(a)(2)(A).

The facts and circumstances of this case have not changed since the Court sentenced the Defendant in May of 2017. At the time of sentencing the Court was provided an extensive 57-page presentence report and had taken the guilty pleas of nine of the Defendant's co-conspirators. The measured reasoning the Court used to determine a middle of the guideline sentences was appropriate and remains valid today. The Court found the specific sentence was imposed because of the need to reflect the seriousness of the offense and to protect the community. (ECF 412.) The sentence should not be reduced, nor should the Defendant be released because the community still needs to be protected and a release would not reflect the seriousness of the offense. This Defendant, created, organized, and led a conspiracy that sold oxycodone pills, heroin and methamphetamine to addicts and then laundered the money to gain substantial wealth. The conspirators laundered $1,466,611.31 in drug proceeds. Approximately $538, 777.86 was traced as going directly to the Defendant. (ECF 272, pp. 3-7.) The Defendant's co-conspirators and children, Sean Jackson and Augustine Jackson, were sentenced to 96 months and 80 months respectively. There is no justice in the leader of the organization serving a shorter sentence than those she convinced to join in her criminal activity. Additionally, the Defendant has demonstrated the danger she is to society. She was convicted of distribution of controlled substances in the state courts of Idaho. The compassion shown in her first drug case, charging it in state court rather than federal court and the imposition of a suspended sentence did not result in deterrence but rather emboldened her. Within months of her release on those charges, she took the lessons she learned as to how law enforcement caught her and

reinvented her organization. This Defendant earned her sentence by engaging in intentional and extensive criminal conduct. She has not demonstrated any medical reason which shows extraordinary or compelling reasons for her release. The Defendant is fully vaccinated and is housed in a facility where nearly 90 percent of her peers are vaccinated. The seriousness of her offense and the need to protect society support her original sentence.

## CONCLUSION

Based upon all of the reasons set forth above, the Court should deny the Defendant's motion for compassionate release.

Respectfully submitted this 1st day of July, 2021.

                                              RAFAEL M. GONZALEZ, JR.
                                              ACTING UNITED STATES ATTORNEY
                                              By:


                                              */s/ Traci J. Whelan*
                                              TRACI J. WHELAN
                                              Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 01, 2021, the foregoing **UNITED STATES' OBJECTION TO MOTION FOR REDUCTION OF SENTENCE UNDER 18 U.S.C. § 3582(c)** was electronically filed with the Clerk of the Court using the CM/ECF system, and that a copy was served on the following parties or counsel by:

| | |
|---|---|
| Loren Michelle Toelle<br>Registration # 53073-048<br>FCI Dublin<br>Federal Correctional Institution<br>5701 8th Street – Camp Parks<br>Dublin, CA 94568 | United States Mail, postage prepaid |

 

        *s/ Carin Crimp*
        CARIN CRIMP
        Legal Assistant